MoKiotey, J.,
delivered the opinion of the Court.
The complainants, who are a part of the distributees of the estate of Moses A. Morgan, who died intestate in Bedford county, in the year 1845, brought this bill to recover certain slaves claimed by them, in the possession of the defendant, Reed. The intestate left a widow and seven children; the latter were then all infants under the age of twenty-one, and two of them are *281 still minors. The oldest daughter, however, had intermarried with one Buckingham, prior to the death of the intestate, during her minority. The widow and said Buckingham were appointed administratros of the estate. In that character they presented a petition to the Circuit Court of Bedford county, to which the distributees were not made parties, for the sale of two slaves, the property of the estate, Mary and Jeff.
At the August Term, 1845, the Court decreed a sale of said slaves, on the statement of the petition, that a sale was necessary “to pay debts, and to make distribution which statement, as the decree recites, was “believed by the Court.” And, accordingly, the two slaves were sold, and purchased by the defendant, Reed, for $675.00. Two of the distributees are dead, to-wit: Malissa, the wife of Buckingham, who died some six years ago; and George, who died in 1855, during minority, and without issue.
This bill was filed on the 24th of August, 1858, by the five surviving children, the widow and Buckingham being made defendants. The Chancellor dismissed the bill.
It is conceded in argument, that the sale of the slaves was void, under the decision in Elliott v. Cochran, 2 Sneed, 468, and other decisions of this Court. But it is insisted, that the complainants right to recover the slaves, is barred by the act of 1855-6, ch. 112, sec. 8, which declares: “ That the title of all persons to any slave or slaves, sold under proceedings of the Circuit, Chancery or County Court, under the act of 1827, and to which the heirs, distributees, or legatees, were not made parties, shall be forever barred, un *282 less suit to recover said slave or slaves shall be instituted within six months after the passage .of this act.”
We feel constrained to declare this extraordinary enactment to be unconstitutional and void. There is much plausibility in the argument, that it violates the spirit of both the 8th and 20th sections of Art. 1, inasmuch as it attempts to deprive certain persons of their property, contrary to “ the law of the landand is also a “retrospective law.” But, perhaps, it is a still more palpable infringement of the provisions of sec. 7, Art. 11, which declares, that “the Legislature shall have no power to suspend any general law, for the benefit of any particular individual. Nor to pass any law for the benefit of individuals, inconsistent with the general laws of the land.”
Can a more direct violation of the true spirit and meaning of these fundamental provisions be imagined, than is presented by the section of the act above cited ? We think not. What does it propose? In some instances, prior to the passage of this act, sales had been made of slaves, under color of judicial proceedings, professing to have been founded upon the act of 1827, but which were, in fact, wholly contrary to law, and void; communicating no title to the purchaser, and divesting no title out of the former owner. By the general law of the land, as it existed at the time of these illegal sales, the persons who had thus been deprived of their property contrary to law, had the unquestionable right to bring suit for its recovery at any time within three years after the sale. And if the owner happened to be an infant, or under other legal *283 disability, his right of action was saved for the period of three years after the disability ceased to exist.
Now, as a sort of “relief measure,” in cases of such irregular and void sales as had been previously made, it is attempted by the act of 1856, in the very teeth of the constitution, (Art. 11, sec. 7,) “to suspend a general law for the benefit of (these) particular individual ” purchasers; or, in other words, “to pass a law for the benefit of individuals, inconsistent with the. general law of the land.”
The act, it will be observed, does not contemplate any change of the' existing “ general law ” in the future; it does not provide, that, in all similar cases of irregular sales of slaves, which may be made after its passage, suits shall be brought within six months, instead of three years.
It is altogether retrospective in its operation, refer-ing, only, to past cases, and having no reference whatever to the future. In short, its whole scope and object, is 'simply to exempt “particular individuals,” or special cases, from the operation of “ the general law of the land;” or, “to suspend the general” law in their favor.
This conclusion, it seems to us, is so obvious, that argument is scarcely necessary to make it clearer.
There is no force in the argument, that the act affects, only, the remedy, and not the right. The remedy is sometimes so incorporated with the right, that it would be extremely difficult, if not impossible, to maintain, in any proper sense, that the former can be impaired without affecting the latter. But this is a point we need not stop to discuss, as it is clear beyond all *284 doubt, that the prohibitions of the constitution, in letter and spirit, apply as much to remedies as to rights. It was thought proper and necessary that the rules regulating the remedy should be equal and uniform in their operation, as well as those regulating the rights of the citizens. And surely this is correct; for if the remedy may' be frittered away, what is the right worth ?
The act is likewise subject to the objection, as has been argued, of being a partial law. It does not profess to be applicable to all illegal sales of slave property, but only to judicial sales, under a particular statute; and not even to all irregular sales under that statute, but only to the special case, where “ the heir, distributees, or legatees were not made parties.” The act seems not to contemplate or provide for other irregularities in proceedings, under the act of 1827, which might avoid a sale; nor does it apply to an illegal sale of slaves by the sheriff, under the ordinary process of fieri facias.
If the act had been merely prospective, so as only to operate on sales to be made after its passage, whatever might be thought of its unreasonable severity and injustice, in extending indiscriminately to all persons, regardless of the rights of those laboring under legal disabilities; still, so far as regards the question of constitutional power, it might, perhaps, be sustained. But being of the character already stated, it is impossible to support it, without yielding to the Legislature the exercise , of a power expressly denied by the constitution.
But, it cannot be necessary to reason upon this subject, as a simple comparison of the act with the pro *285 visions of the constitution, demonstrates at once their entire incompatibility.
But, it is argued for the defendant, that admitting the act of 1856 to be void, still, the complainants are barred by the general statute of limitations of three years. And this conclusion, it is assumed, results from, the application of the principle of Shute v. Wade, 5 Yer., to the facts of the case. It is insisted, that inasmuch as the widow, who was a distributee, and Buckingham, in right of his wife another distributee, were free from disability, that the statute began to operate in favor of the defendant, Reed, and against all the distributees, from the time of the sale and purchase of the slaves in question. This reasoning is fallacious: and is an attempt to misapply the true principle of the case of Shute v. Wade, which is, that if one of the parties be free from disability, and in a condition to be capable of suing, the statute will run. against all. But here, the widow and son-in-law, Buckingham, as administrators, had disabled themselves to sue, and were placed under an estoppel to do so, by the fact that the sale was made upon their own application, and by themselves; and because, the sale, though void as to the infants, not parties, was binding upon them, and operated to divest them of their respective interests, and to transfer the same to the purchaser. The reason of the rule in Shute v. Wade, does not, therefore, apply to the present case.
And the only question is, whether the fact, that two of the distributees, who were joint owners with the infants of the slaves and who were sui juris, having disabled themselves to sue, shall have the effect of destroying the right of recovery of the other joint owners, so *286 far as the interests of the latter are involved. We think not, upon well established principles. The effect of the sale, so far as the widow and Buckingham are concerned, was, as we have seen, to divest them of their interests, and vest the same in the purchaser. It was, in effect, by operation of law, a sale of their distributive shares to the latter. And in this view, it operated a severance of the joint interest, by their act; and, by legal consequence, left the infants who were not parties and had no participation in the matter, at liberty to sue separately for their distributive shares, as if there had never existed a unity of title, or of interest between them, and the other two distributees, to the slaves in controversy. Parker v. Elder, 11 Hum., 546. This being so, the five complainants in this suit, who were all minors when their right of action accrued, and of whom two are still minors, are within the saving of the statute, as expounded in Shute v. Wade; and, consequently, may well maintain the present suit, to recover five-eighths of the slaves in controversy. As to the minor who died in 1855, as there is no representative of his estate before the Court, no decree can be made in respect to his interest.
But, as the complainants seek equity, they must do equity; and, therefore, if it shall appear, upon an inquiry to be made before the master, that the proceeds of the sale of the slaves were applied by the administrators in discharge of debts due from the intestate’s estate, in the proper course of administration, or otherwise properly applied to the benefit of complainants, the latter will be held bound to refund to defendant, Reed, five-eighths of the price paid by him for the slaves, with interest *287 thereon; and their interests in the slaves 'will he held liable for the same if not otherwise paid.
Decree of the Chancellor reversed, and a decree will be rendered conformable to this opinion.